UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ROBERT D. KORNAGAY (Pro Se)
                    Plaintiff,

-vs-                                    CASE#: 2:23-cv-1150-SPC-NPM

SERGEANT R. TABIL
OFFICER S. COREFF
OFFICER BIAS
CAPTAIN GARMET
MAJOR JOHN DOE
COLONEL SCARPATTY
ASST. WARDEN J. DAWSON
WARDEN D. SNIDER
NURSE R. ZABALA
MEDICAL DIRECTOR G. NOE
SEC'Y OF FLA DEP'T OF CORR. (REP) J. ADAMS
SEC'Y OF FLA DEP'T OF CORR. (REP) A. JOHNS
                    Defendant(s)  /

FILED - USDC - FLMD - FTM
DEC 15 2023 PM2:58

## CIVIL RIGHTS COMPLAINT

(Section 1, Parties to the Complaint:)

A) The Plaintiff
   Name: Robert D. Kornagay
   Other Names known by: New York and Messiah
   Prison ID#: J13805
   Current address: Reception Medical Center, P.O. Box 628, Lake Butler
                    Florida 32054

B) The Defendant(s)
   Defendant #1
   Name: R. Tabil
   Job or Title: Sergeant at Charlotte Correctional

1 of 25

Institution
Address: 33123 OIL Well Road
         Punta Gorda, Fla 33955
Capacity: Individual Capacity

Defendant #2
 Name: S. Coreff
 Job or Title: Correctional officer at Charlotte Correctional
              Institution
 Address: 33123 OIL Well Road
          Punta Gorda, Fla 33955
 Capacity: Individual capacity

Defendant #3
 Name: Bias
 Job or Title: Correctional officer at Charlotte Correctional
              Institution
 Address: 33123 OIL Well Road
          Punta Gorda, Fla 33955
Capacity: Individual Capacity

Defendant #4
 Name: Garmet
 Job or Title: Captain at Charlotte Correctional Institution
 Address: 33123 OIL Well Road
          Punta Gorda, Fla 33955
Capacity: Individual Capacity

Defendant #5
 Name: Scarpatty
 Job or Title: Colonel at Charlotte Correctional Institution

Address: 33123 Oil Well Road
          Punta Gorda, Fla 33955
Capacity: Individual Capacity

Defendant #6
Name: J. Dawson
Job or Title: Asst. Warden at Charlotte Correctional Inst-
              itution
Address: 33123 Oil Well Road
          Punta Gorda, Fla 33955
Capacity: Individual Capacity

Defendant #7
Name: D. Snider
Job or Title: Warden at Charlotte Correctional Institution
Address: 33123 Oil Well Road
          Punta Gorda, Fla 33955
Capacity: Individual Capacity

Defendant #8
Name: R. Zabala
Job or Title: Nurse at Charlotte Correctional Institution
Address: 33123 Oil Well Road
          Punta Gorda, Fla 33955
Capacity: Individual Capacity

Defendant #9
Name: G. Noe
Job or Title: Medical Director at Charlotte Correctional
              Institution
Address: 33123 Oil Well Road

Punta Gorda, Fla 33955
Capacity : Individual and Official Capacity

Defendant #10
Name : John Doe
Job or Title : Major at Charlotte Correctional Institution
  Address : 33123 Oil Well Road
            Punta Gorda, Fla 3955
Capacity : Individual Capacity

Defendant #11
Name : J. Adams
Job or Title : Representative for Secretary of Fla Dept of Corr.
Address : Central office, 501 S. Calhoun Street, Tallahassee, Fl 2399
Capacity : Individual Capacity

Defendant #12
Name : A. Johns
Job or Title : Representative for Secretary of Fla Dept of Corr.
Address : Central office, 501 S. Calhoun Street, Tallahassee, Fla 32399
Capacity : Individual Capacity

(Section 2 :)    JURISDICTION
Plaintiff brings this lawsuit pursuant to 42 U.S.C 1983.
This Court has jurisdiction under 28 U.S.C. 1331 and 1343. Plaintiff
also seeks a declaratory judgment, pursuant to 28 U.S.C 2201.

(Section 3 :)    VENUE
The District of Fort Myers is the appropriate venue
under 28 U.S.C 1391(b)(2) because the events and omissions
giving rise to the claims occurred in this district.

STATEMENT OF CLAIMS AND EXHAUSTION OF CLAIMS

Plaintiff will now setforth Specific constitutional acts and omissions the Defendant(s) in this action violated:

1) Plaintiff's 1st and 8th Amendment Claims against Defendant Tabil are for retaliating against Plaintiff for past litigation and filing grievances, labeling Plaintiff as a Snitch, orchestrating an attack on Plaintiff, and harrassing Plaintiff with threats of violence for over a year - has been exhausted. (See informal and formal grievance, Log#'s 2306-510-136 and 510-2201-0137- Both approved) All Claims against Defendant Tabil are ripe for litigation.

2) Plaintiff's 8th Amendment Claim against Defendant(s) Coreff and Bias are for orchestrating an attack on Plaintiff, has been exhausted. Plaintiff filed a formal grievance at the institution level that was approved. (See Formal grievance, Log#2306-510-136) All Claims against Defendant(s) Coreff and Bias are ripe for litigation.

3) Plaintiff's 8th Amendment and 1985 Conspiracy Claim against Defendant(s) Noe, Zabala, and Garmet are for being deliberately indifferent to Plaintiff's Serious Medical needs. And by them Conspiring, to deprive Plaintiff of his 8th Amendment right and orchestrating a cover up of their unlawful conduct - has been exhausted. (See formal grievance, Log# 2306-510-140, and Appeal, Log#23-6-22857), (formal grievance, Log# 2309-510-153), and As for Defendant Garmet, Plaintiff filed an informal grievance that was denied, so he filed a formal grievance that the Warden refused to respond to as of this date, making that remedy unavailable, but Plaintiff still appealed in good faith. (informal, formal, and Appeal Log#'s 510-2308-0172, 2308-510-151, and 23-6-30855) All Claims against Defendant(s) Noe, Zabala,

and Garnet are ripe for litigation.

4) Plaintiff's additional 8th Amendment Claim against Defendant Noe is for refusing to provide/issue Plaintiff a Front handcuff pass in order to alleviate Plaintiff's unnecessary pain and suffering - has been exhausted. (See Formal grievance and Appeal, Log#'s 2310-510-010 and 23-6-34073) This claim against Defendant Noe is ripe for litigation.

5) Plaintiff's 8th Amendment Claim against Defendant(s) A. Johns and J. Adams for being deliberately indifferent to Plaintiff's need for protection - has been exhausted. (Formal grievance, Log# 2306-510-136, Approved) All claims against Defendant(s) Johns and Adams are ripe for litigation.

6) Plaintiff's 8th Amendment Claim against Defendant(s) Snider, Scarpatty, and Dawson are for being deliberately indifferent to Plaintiff's need for protection - has been exhausted. (See Formal grievance, Log# 2306-510-136, Approved) All claims against Defendant(s) Snider, Scarpatty, and Dawson are ripe for litigation.

7) Plaintiff's 8th Amendment Claim against Defendant(s) Snider, Dawson, Scarpatty, John Doe, and Garnet are for being deliberately indifferent to the substantial risk of serious harm posed against inmates on Close Management at Charlotte C.I., by inmates escaping their handcuffs. (Based upon their knowledge of prior incidents) Plaintiff has exhausted this claim by way of filing an informal grievance at the institutional level, which was denied. Then he appealed that decision to the warden, which the warden refused to repond to as of this

date - making that remedy unavailable. However, Plaintiff
still appealed in good faith. (Informal, formal, and appeal Log#'s
510-2308-0172, 2308-510-151, and 23-6-30855) All claims against
Defendant(s) Snider, Dawson, Scarpatty, John Doe, and Garmet
are ripe for litigation.

(Section 4:)
## PLAINTIFF'S PREVIOUS LAWSUIT

1. Plaintiff: Robert D. Hornagay
    Defendant(s): Officer Burt, Officer Covan, Officer Engstrom,
              Officer Grace, Sergeant Raybon, Lietenant
              Gielow, and Lieutenant Orsa.
   Court: Northern District of Florida, Pensacola Division
   Docket Number: 3:09 cv 281/LAC/EMT
   Name of Judge: Elizabeth M. Timothy
   Facts and basis of the law suit: Defendants retaliated against
                        Plaintiff for writing grievances
                        by way of intercepting his mail,
                        false disciplinary reports, and using force.
Disposition: Plaintiff and Defendants agreed on a settlement.
Approximate filing date: June 28, 2009
Approximate disposition date: March 24, 2011

2. Plaintiff: Robert D. Hornagay
    Defendant(s): Officer L. Diedoman and Sergeant J. Wilburn
    Court: Middle District of Florida, Jacksonville Division
    Docket Number: 3:17-cv-795-J-34 MCR
    Name of judge: N/A
    Facts and basis of the law suit: Defendants retaliated against

Plaintiff for writing grievances by failing to protect
Plaintiff and assisting in the attack against Plaintiff.
Disposition: Plaintiff and Defendants agreed on a settlement
Approximate filing date: July 7, 2017
Approximate disposition date: August 13, 2021


3. Plaintiff: Robert D. Kornagay
Defendant(s): Officer Fenner, Officer Slattery, Officer
Smith, Officer Weekly, Officer Johnson,
Officer Roberts, Sergeant Nolan, and
Sergeant Given.
Court: Northern District of Florida, Pensacola Division
Docket Number: 3:11-cv-428-LAC/EMT
Name of Judge: Elizabeth M. Timothy
Facts and basis of the lawsuit: Defendants retaliated against
Plaintiff for writing grievances
on his behalf and on behalf of
other inmates by way of failing
to protect him from assault
and refusing him medical
treatment.
Disposition: Plaintiff's medical claim was dismissed at
Summary Judgment and Plaintiff lost trial
on his failure to protect claim.
Approximately filed: September 7, 2011
Approximately disposition date: August 6, 2014


## NOTICE

Notice is provided that Plaintiff, Robert D. Kornagay,
has filed two (2) additional 42 U.S.C. 1983 Civil Rights
Complaints. UNFORTUNATELY, Plaintiff has lost all of his

paper work to those two (2) additional cases. And he is only able to provide the following limited information about both case(s):

1) Plaintiff filed a case in the Northern District of Florida, Pensacola Division. This case was about a mail-ordered publication being rejected by a prison mail room officer. Plaintiff moved to have the case dismissed before service was complete.

2) Plaintiff filed a case in the Southern District of Florida, Miami Division. This case was about unsafe living conditions. The court dismissed Plaintiff's case before service was complete.

(Section 5:)

## STATEMENT OF FACTS

1) At all times material hereto, Robert D. Hornaggy, was an inmate in the care and custody of the Florida Department of Corrections (FDOC).

2) At all times mentioned in this complaint each defendant was either employed as a correctional officers of the FDOC or was an employee of the private contractor, Centurion, for FDOC at Charlotte Correctional Institution, or a representative for the Secretary of FDOC and acted under the color of state law.

3) On or about the date of December 1, 2021, while in E-dormitory at Charlotte C.I., Defendant Tabil searched Plaintiff's cell and discovered Plaintiff's prior law suit filed and settled against other officers.

4) Upon discovering these documents, Defendant Tabil began harassing Plaintiff with threats of violence because of the prior law suit.

5) On or about the date of December 18, 2021, Defendant Tabil stated to Plaintiff, "You are in #70,000 worth of debt, thanks to your little law suit, you f***k with one of us, you f***k with all of us, and we'll collect every dime back even if it's collected in blood."

6) On that same date, Plaintiff started to fear for his safety and sought help by filing an informal grievance, Log#510-2112-0494, to the warden of Charlotte C.1., Defendant Snider.

7) In Plaintiff's informal grievance, he informed Defendant Snider of Defendant Tabil's harassment, threats to cause him physical harm, and Defendant Tabil's intent to retaliate against him. Plaintiff made it clear in his grievance that he was living in fear of Defendant Tabil and that this informal grievance, Log#510-2112-0494, was a grievance seeking protection.

8) Although Plaintiff's informal grievance was approved by the grievance coordinator for an allege investigation, that Plaintiff was never interviewed or involved in, nothing was ever done to better Plaintiff's circumstances. Every week, Defendant Tabil was still assigned as the sergeant over the dorm in which Plaintiff was housed. Defendant Tabil would torment Plaintiff with threats of violence and threats to spit and put feces in Plaintiff's food.

9) On December 31, 2021, Defendant Tabil labeled Plaintiff as a snitch because of Plaintiff's prior law suit. Defendant Tabil then attempted to provoke, encourage, manipulate, challenge, and incite over fifty (50) prisoners to harm Plaintiff by falsely informing them that Plaintiff was a snitch and the reason their contraband was always being confiscated. Defendant Tabil then challenged these inmates by stating, "CM is suppose to consist of the most violent and dangerous gangbangers in the State of Florida, so how the f***k you guys let a known snitch live around you? It is a fact that the mother f****er in cell 3107 is a rat, yes homagay!'"

10) With over twenty (20) years incarcerated in Florida prison

System, Plaintiff has never provided prison officials or any kind of law enforcement agency with any kind of information relating to illegal activity committed by any other inmates.

11) On January 5, 2022, Plaintiff filed another informal grievance, Log# 510-2201-0137, addressed to Defendant Snider. In this grievance, Plaintiff described in full detail Defendant Tabil's conduct and the statements made on December 31, 2021. Plaintiff sought "immediate protection" because he was in fear for his safety from inmates and Defendant Tabil.

12) On January 20, 2022, Plaintiff's informal grievance, Log# 510-2201-0137, was also approved by the grievance coordinator for an allege investigation that Plaintiff was never interviewed or involved in.

13) On January 25, 2022, Plaintiff filed a formal grievance, Log# 2201-510-132, to Defendant Snider and attached a copy of the detailed informal grievance, Log# 510-2201-0137. In Plaintiff's formal grievance, he described Defendant Tabil's conduct and explained to Defendant Snider, "although my informal grievance, like the last one, was approved and referred to Security for investigation, I'm seeking a more adequate and immediate response to my need for protection, while this alleged investigation is underway.... It's like I'm a sitting duck surrounded by hunters, please help me."

14) On or about the date of January 28, 2022, Plaintiff informed Defendant(s) Scarpatty and Garnet that Defendant Tabil had labeled him as a snitch and continue to falsely inform all the inmates that Plaintiff is the reason for their contraband being confiscated. Plaintiff explained that he was living in fear of the inmates and Defendant Tabil. Plaintiff asked for some form of immediate protection while the investigation was pending.

15) As to the claim in paragraph 14, Defendant Scarpatty informed Plaintiff that if he [Plaintiff] was afraid of the inmates and staff members at Charlotte C.I. then Plaintiff should have never returned to Charlotte C.I. for the second time. Defendant Scarpatty then threatened

to have a all out bulletin placed on Plaintiff if he [Plaintiff] put anything else in the grievance box about the "1abil issue".

16) On January 29, 2022, Plaintiff filed an emergency grievance, Log# 22-6-06521, to the Secretary of FDOC, enclosed in an envelope in order to avoid detection from Defendant Scarpatty. In Plaintiff's emergency grievance, he described the threat made by Defendant Scarpatty, but felt he was left with no choice but to continue to seek help because he felt as if his days are numbered. Plaintiff described how Defendant 1abil labeled him as a snitch and continue to inform inmates that Plaintiff was the reason for their contraband being confiscated. Plaintiff made it clear; "I'm seeking immediate protection, for my life is in danger." He also cited informal grievance Log#'s 510-2201-0137 and 510-2112-0494, for details about the circumstances in which he faced.

17) On February 17, 2022, Plaintiff's formal grievance, Log# 2201-510-132, was responded to and denied by Defendant Scarpatty stating, "The subject of your grievance has already been reported and is still pending investigation."

18) As to the claim in paragraph 17, Defendant Scarpatty failed to respond to Plaintiff's need for help in any way to eliminate the risk posed against Plaintiff. The circumstances in which Plaintiff lived only got worst - as other inmates blamed and threatened him because of their lost, and Defendant 1abil continued to terrorize him.

19) On March 4, 2022, the Secretary of FDOC representative, Defendant Johns rejected Plaintiff's emergency grievance, Log# 22-6-06521, without action asserting that Plaintiff's grievance is not of an emergency nature.

20) As to the claim in paragraph 19, Defendant Johns directed Plaintiff to file an informal grievance to Defendant Scarpatty, the same person who threatened to have an all out bulletin on Plaintiff if he put another grievance in the box.

21) Defendant Johns forwarded a copy of Plaintiff's emergency

grievance, Log# ZZ-6-06521, to Defendant Snider's office.

22) Being that Florida Aministrative Code, Rule 33-103.002(4), defines an emergency grievance as, "A grievance of those matters which, if disposed of according to the regular time frames, would subject the inmate to substantial risk of personal injury or cause other serious and irreparable harm to the inmate."

23) As to the claim in paragraph 22, Plaintiff's emergency grievance, Log# ZZ-6-06521, was in compliance and met the definition of an emergency grievance.

24) On or about the date of March 8, 2022, Plaintiff plead his need for immediate protection, while the allege investigation was pending, to Defendant(s) Snider and Dawson. Plaintiff explained that Defendant Kabil's actions in falsely labeling him as a snitch has created an environment that is hostile towards him, and he is living in fear because other inmates now blame him for their cell phones and drugs being confiscated. Plaintiff informed both Defendant(s) of the threats on his life made by inmates and asked for immediate protection.

25) As to the claim in paragraph 24, Defendant(s) Snider and Dawson assured Plaintiff that they read his grievances about the issue and they did what they were required to do. Defendant Dawson stated that the investigation could take a couple of months, so Plaintiff just had to wait on the outcome of the investigation. They offered no other alternative or help for Plaintiff.

26) Although Florida Aministrative Code, Rule 33-602.221(b), asserts that inmates in close management are not eligible for placement in protective management, there are procedures outlined in F.A.C., Rule 33-602.220 (3)(c) & (3)(d) for inmates that fear for their safety from staff and inmates.

27) As to the claim in paragraph 26, Although Plaintiff was in fear of both staff and inmates, the procedures outlined in F.A.C., Rule 33-602.220(3)(c) & (3)(d) were never initiated or followed. Plaintiff was never encouraged to provide information or cooperate with any investigation of the matter,

never interviewed by any investigator about the matter, and the institution classification team (I.C.T) never interviewed Plaintiff or held a protection hearing to determine whether the Plaintiff have a ligitimate need for protection, as required by FDOC rules. This procedure is required to be initiated by any employee that is informed that an inmate is in fear and seeks protection.

28) The Defendant(s) also had other options at their disposal in order to eliminate the risk of harm to Plaintiff, but they refused to explore those options. Defendant Tabil continued to be assigned to the dorm Plaintiff lived.

29) On March 3, 2022, Plaintiff filed an administrative appeal of formal grievance, log# 2201-510-132, to the Secretary of FDOC. In Plaintiff's "Request for Protection Appeal", Log# 22-6-08016, he provided a detailed description of all the obstacles he faced in pursuit of protection and stated, "On a weekly basis this officer [Tabil] continue to work in the same dorm as me and provoke the Bloods, Crips, Folks, latin kings, Oks, and other gangs to harm me. If I'm not protected soon I'm dead, please help me!"

30) Plaintiff attached his informal grievance, Log# 510-2201-0137, and formal grievance, Log# 2201-510-132, to his "Request For Protection Appeal".

31) As to the claim in paragraph 30, On March 22, 2022, the Secretary of FDOC representative, Defendant Adams denied Plaintiff's "Request For Protection Appeal", leaving Plaintiff no other available options.

32) On or about the date of September 25, 2022, Defendant Tabil tried to force Plaintiff to write a witness statement asserting that all of his prior grievances filed against Defendant Tabil and other officers are false. In exchange, Plaintiff will be able to live a normal life and avoid what him [Defendant Tabil] and other officers have in store for Plaintiff.

33) As to the claim in paragraph 32, Plaintiff refused to write the statement.

34) Defendant Tabil then informed Plaintiff that there were other "pen-pushers" before Plaintiff and "We broke all of them. We beat one so bad, he can't remember his own name. And we made one look like a suicide. You just don't know how easy this shit is."

35) Although the threats of retaliation from Defendant(s) Tabil

and Scarpatty chilled Plaintiff's First Amendment Right, Plaintiff continued to file grievances seeking help, but these grievances were either rejected, intercepted, or ignored.

30) On June 18, 2023, Defendant Tabil accused Plaintiff of helping his cellmate, Errick Holmes, with filing a lawsuit against four (4) prison officials at Charlotte C.I., then stated, "You was able to duck the last bullet because you went back to CM 1 for your little hostage game, but you're back on CM 2 and it don't look like your little grievances crying for protection was enough to fight the power." Defendant Tabil made an attempt to spit on Plaintiff and stated, "F**k your grievances, enjoy the cake we baked."

31) On June 18, 2023, at approximately 7:30 pm, Defendant(s) Coreff and Bias strip searched and placed hand and leg restraints on Plaintiff and every inmate attending dayroom to watch TV and/or use the kiosk.

38) While Plaintiff waited on his second turn to use the kiosk, Defendant(s) Coreff and Bias disregarded FDOC policy by allowing an unknown inmate to go back inside his cell, without being monitored, where he was able to retrieve a homemade shank and return to the dayroom without being searched by either Defendant.

39) Per FDOC policy, any time an inmate leaves his cell, he is suppose to be searched for contraband.

40) Moments after this unknown inmate returned to the dayroom, he escaped out of his handcuffs with a homemade key and attacked Plaintiff from behind with a homemade shank.

41) Plaintiff was stabbed three (3) times, twice in the neck and once in the upper back.

42) At no time during the armed attack against Plaintiff, did the Defendant(s) Coreff or Bias stop, intervene, or restrain Plaintiff's attacker, instead Defendant Coreff used force on Plaintiff by throwing him to the ground.

43) In attempt to prevent further attack, another inmate tried to

aid and defend Plaintiff, who was hurt and unable to defend himself.

44) At approximately 8:30 pm, Plaintiff was seen by medical staff, Defendant Zabala and an unknown nurse. Plaintiff informed them both that he was experiencing excruciating pain in his neck and back, in which traveled down his right arm and his right hand was numb and had a tingling sensation. Plaintiff also informed Defendant Zabala that he felt very dehydrated, dizzy, and weak as if he was going to pass out.

45) As to the claims in paragraph 44, Defendant Zabala and the unknown nurse could not stop Plaintiff's stab wounds from bleeding, and Defendant Zabala explained to Plaintiff that she need to have him sent to the outside hospital for examination of his cervical spine area, where the knife entered, and additional treatment that could not be provided at the prison because of the lack of equipment and there was no doctor on duty.

46) Defendant Zabala made a telephone call, in the presence of the Plaintiff, to the off duty prison doctor/Medical director, Defendant Noe, and informed him that Plaintiff was stabbed in the upper back and twice in the neck, one of the wounds were directly on his cervical spine area. She informed Defendant Noe of Plaintiff's continued bleeding and her intentions on having Plaintiff sent to the hospital.

47) As to the claims in paragraph 46, Defendant Zabala informed Plaintiff that Defendant Noe refused her request to send him to the hospital, so the best thing for Plaintiff to do was to move as less as possible to avoid further injury to his neck and slow down the loss of blood.

48) Plaintiff's plea for something to help alleviate the pain and to be sent to the outside hospital was cut short by Defendant Garnet, who was present in the triage room and witnessed Plaintiff's condition. Defendant Garnet informed Plaintiff, "We just had two inmates come back from the hospital today and we don't have the time or staff to send anyone else out."

49) At approximately 8:45 pm, Plaintiff's medical treatment came to an end, with Plaintiff's stab wounds being cleaned and bandaged,

Plaintiff being provided with a cup of water to counter his dehydration, and, Plaintiff being provided with instructions to avoid movement to prevent bleeding out.

50) Being that the triage room was out of stock of pain alleviating medication, Plaintiff was never provided with any.

51) Upon information and belief, On June 18, 2023, between 8:00 pm until the end of the shift, Defendant Garmet was the officer in charge (OIC) at Charlotte C.I., and he had the authority to over rule medical staff's decision and have Plaintiff sent to the out-side hospital for treatment of Plaintiff's obvious, painful, and deteriorating condition, but instead he encouraged for Plaintiff not to be sent.

52) Instead of Defendant(s) Zabala and Garmet having Plaintiff housed in the infirmary unit, under medical observation, Plaintiff was moved to A-dormitory by Defendant Garmet into a cell under work order because there was no drinking water.

53) Everything stated in this complaint from paragraph 44, through 52, can be verified by the handheld use of force video camera.

54) Upon information and belief, Defendant Garmet failed to brief and/or ensure that the following shift of officers in A-dormitory was informed of Plaintiff's condition.

55) At approximately 9:20 pm, Defendant Tabil delivered Plaintiff's personal property to Plaintiff. Defendant Tabil, with no other officer present, ordered Plaintiff to submit to hand restraints and entered the cell with Plaintiff.

56) As to the claim in paragraph 55, Once Defendant Tabil was inside the cell with Plaintiff, he told Plaintiff, "The only reason you escaped is because that little wet-back friend of yours got in our business, but I guarantee that the next shot we send is going to f*ck you up for life..."

57) Per FDOC policy, anytime an inmate's cell door is opened there must be two officers present.

58) Although Defendant(s) Bias and Coreff witnessed the attack

On Plaintiff and the attack was caught on video footage. Plaintiff's attacker never received a disciplinary report for escaping his hand restraints, possession of a weapon, possession of a homemade handcuff key, or the armed battery, as required by F.DOC policy.

59) Throughout the rest of the night and early morning hours, Plaintiff remained locked in the cell by himself, where he suffered from excruciating pain in his neck and back, dizziness, dehydration, and Plaintiff continued to lose blood until his pants, socks, and bed sheets were dilapidated by blood.

60) As to the claims in paragraph 59, at approximately 5:30 am, Plaintiff start feeling light headed and fell to the ground, hitting his head on the wall before losing consciousness. Plaintiff remained unconscious until approximately 5:50 am. It wasn't until an inmate orderly witnessed Plaintiff's condition and reported it to the officer and sergeant of A-dormitory.

61) On June 19, 2023, at approximately 6:30 am, the two correctional officers helped Plaintiff into a wheel chair, because he was weak and disoriented, then he was transported to the medical building, where he was seen by Defendant Noe - at approximately 8:20 am.

62) As to the claim in paragraph 61, Plaintiff informed Defendant Noe of his neck and back pain, lack of mobility in his neck, migraine headaches, dehydration, lost of consciousness, and his head injury from the fall.

63) Defendant Noe gave Plaintiff injections of lidocaine 1% in his neck and back before using sutures to close Plaintiff's wounds, and Plaintiff was informed that he'll regain normal mobility in his neck when the swelling goes down. In addition, Defendant Noe ordered Plaintiff a prescription of Tylenol.

64) As to the claims in paragraphs 44 through 61, Defendant(s) Noe, Zabala, and Garnet were deliberately indifferent to Plaintiff's obvious medical needs.

65) On or about the date of June 21, 2023, at approximately 8:30 am, the lidocaine wore off, and Plaintiff began experiancing a lot of pain in his neck

and back, in addition to the migraine headaches.

66) On June 21, 2023, at approximately 3:00 pm, Plaintiff's prescription of Tylenol was delivered to him (Tylenol 325 MG, QTY of (30) tablets to last 90 days)

67) On June 24, 2023, Plaintiff put in a sick call request seeking treatment for the migraine headaches, pain in his neck and back, and the numbness in his right hand.

68) As to the claim in paragraph 67, On June 26, 2023, while nurse Scott removed Plaintiff's sutures, Defendant Noe addressed Plaintiff's sick call and verbal complaints about the Tylenol 325 MG being ineffective in alleviating his pain and suffering. In response, Defendant Noe provided Plaintiff with three (3) packs of Acetaminophen 325 MG with two (2) tablets in each pack and ignored Plaintiff's request for a more adequate supply and higher dosage of pain alleviating medication.

69) On a daily basis, Plaintiff continued to suffer excruciating pain in his neck and back, the mobility in his neck continued to reduce, his right hand remained numb with a tingling sensation, and his none stop migraine headaches would get so bad it would bring tears to his eyes.

70) For almost a month, Defendant Noe was deliberately indifferent to managing and treating the chronic pain associated with Plaintiff's medical condition.

71) Plaintiff continued to write sick call requests seeking some kind of treatment for the pain in his neck and back, migraine headaches, and numbness in his right hand. Plaintiff also sought a higher dosage of pain relievers.

72) On July 17, 2023, while being examined by Defendant Noe and (APRN) Ms. Sharp, Plaintiff's sick call requests were addressed along with the limited/reduced mobility issue he was having with his neck.

73) As to the claims in paragraphs 71 and 72, Ms. Sharp promised to order Plaintiff something to alleviate his neck and back pain along with something for the migraine headaches. Ms. Sharp also moved to have Plaintiff seen by an orthopedist.

74) On July 28, 2023, Plaintiff's prescription of Pain Reliever Plus was delivered to him. (Pain Reliever Plus 565 MG, QTY (30) tablets to last 90 days)

75) On August 9, 2023, Plaintiff's prescription of Lidocaine 5% ointment was delivered to him.

76) On August 16, 2023, Plaintiff's prescription of Prednisone 10 MG began being provided twice a day for fourteen (14) days.

77) On October 17, 2023, Plaintiff was seen by someone who identified himself as an orthopedict, who recommended that Plaintiff be provided with pain medication and physical therapy for Plaintiff's neck and back, along with the reduced/limited mobility in Plaintiff's neck.

78) On October 25, 2023, Plaintiff's perscription of Ibuprofen was delivered to him. (Ibuprofen 600 MG, QTY (30) tablets to last 90 days)

79) On November 1, 2023, Plaintiff was transfered to the Reception and Medical Center of North Florida, for physical therapy to reduce his pain and regain normal mobility in his neck and his right hand.

## PRIOR INCIDENTS

80) Prior to June 18, 2023, Defendant(s) Snider, Dawson, Scarpatty, John Doe, and Garmet all had prior knowledge of the substantial risk of serious harm inmates at Charlotte Correctional Institution faced, by inmates escaping from their handcuffs by way of using homemade handcuff keys, paper clips, or using lubricants in order to attack other inmates.

81) As to the claims in paragraph 80, each Defendant was placed on notice of the risk posed against inmates on close management, who choose to attend out-of-cell activities, such as dayroom, mental health treatment groups, recreation, and medical callouts.

82) These Defendant(s) were all placed on notice about the substantial risk of serious harm posed to inmate(s) by way of prior incidents, inmate grievances, written and verbal complaints, incident reports, disciplinary reports and appeals thereof, log books, use of force reports, video recordings, memorandums, reports, correspondence, notes, and etc.

83) Although Defendant(s) Snider, Dawson, Scarpatty, and Garmet all had know-ledge of the substantial risk of serious harm posed against inmates on close management at Charlotte C.I., they failed to take reasonable protective measures in response to the known risk of harm.

84) Defendant(s) Snider, Dawson, Scarpatty, and Garmet were all in a position to eliminate the substantial risk of serious harm posed against inmates at Charlotte C.I., but they failed to do so.

85) As to the claim in paragraph 84, the Defendant(s) failure to respond reasonably to the threat posed by inmate(s) escaping out of their hand restraints resulted in Plaintiff being viciously attacked and stabbed twice in the neck and once in the upper back.

### CONSPIRACY to DEPRIVE PLAINTIFF OF CONSTITUTIONAL RIGHTS

86) Plaintiff is entitled to relief against Defendant(s) Noe, Zabala, and Garmet, because in the course of the unconstitutional injuries suffered by Plaintiff, the Defendant(s) conspired, by concerted action to accomplish an unlawful cover up.

87) In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity. More specifically, Defendant(s) reached an implicit or explicit understanding to engage in the following wrongful acts:

A) On June 23, 2023, Plaintiff filed a formal grievance, Log# 2306-510-140, which related to the delayed and inadequate treatment he received for his injuries. This complaint was the cause and beginning of Defendant(s) Noe, Zabala, and Garmet cover up.

B) On September 14, 2023, Plaintiff received a pre-paid copy of his medical records and noticed that they contained false documentation regarding the injuries and treatment provided to Plaintiff after being attacked on June 18, 2023.

C) On June 18, 2023, after being attacked, force was used on Plaintiff, resulting in the use of force camera being activated and used throughout Plaintiff's entire medical examination by Defendant Zabala. However, it was falsely documented in Plaintiff's medical records that force was never used against him.

(D) On June 18, 2023, during Plaintiff's medical examination, he was bleeding profusely from the three (3) stab wounds. He was bleeding so bad that his uniform was ruined. However, it was falsely documented in Plaintiff's medical records that the bleeding was merely "oozing/minimal".

(E) On June 18, 2023, after being attacked, Plaintiff was experiencing excruciating pain and informed Defendant Zabala that on a scale from one (1) through ten (10), with ten (10) being the highest level of pain- Plaintiff was experiencing an eight (8). However, it was falsely documented in Plaintiff's medical records that he reported his pain level at a five (5).

(F) On June 18, 2023, During Plaintiff's examination, he reported his pain level at an eight (8). But Plaintiff was never provided with any pain alleviating medication. However, Plaintiff's medical records falsely asserts that Plaintiff was provided with Acetaminophen 325MG oral tablets.

(G) On June 18, 2023, During Defendant Zabala's examination of Plaintiff, She informed him that due to the continued bleeding, amount of blood he already lost, and the area in which he was stabbed, she need to send him to the out-side hospital for stitches and further examination of his cervical spine. While in Plaintiff's presence, Defendant Zabala made a telephone call to the medical director - Defendant Noe. She informed Defendant Noe that Plaintiff needed to be sent to the outside hospital. Although Defendant Noe's response could not be heard, Defendant Zabala criticized Defendant Noe's decision and informed Plaintiff that Defendant Noe refused her request to send him to the out-side hospital, and he [Defendant Noe] will close Plaintiff's wounds the next day. However, it was falsely documented in Plaintiff's medical records that Defendant Noe was only called for Suturing at 2152 and he ordered her to cover the wounds, so he could do Suturing the next day.

(H) On June 19, 2023, Plaintiff was transported to medical by security in a wheel chair, and Plaintiff informed Defendant Noe that during the early morning hours he fell, hit his head, and lost consciousness. However, Defendant Noe refused to document Plaintiff's head injury or lost of consciousness in Plaintiff's medical records.

I) Plaintiff's medical records for June 18 and 19, 2023, were signed by both Defendant(s) Zabala and Noe.

J) Being that force was used on Plaintiff after he was attacked, the use of force camera is direct evidence that during the medical examination by Defendant Zabala, Plaintiff was bleeding profusely, he was never provided with any pain alleviating medication, and in response to Plaintiff's repeated complaints of pain, weakness, feeling light headed, and dehydration he [Plaintiff] was only provided with a cup of water.

K) Being that the use of force camera recorded the entire medical examination, it would be impossible for Defendant(s) Noe and Zabala to orchestrate a cover up, with the video tape from the post use of false in circulation, which leave these Co-Conspirators with no choice but to come into agreement with Defendant Garmen to aid each other in concealing the wrongful and illegal acts.

L) Upon information and belief, on June 18, 2023, between 7:30 p.m. and Shift Change, Defendant Garmet was the officer in charge (OIC) at Charlotte C.I.

M) Defendant Garmet was placed on notice by Plaintiff's informal grievance, Log# 510-2308-0172, that he could possibly be held liable for his participation in what he knew was unconstitutional and unlawful activity.

N) Defendant Garmet furthered this conspiracy to hide, destroy, and alter evidence to cover up the Co-Conspirators decision to deprive Plaintiff of his obvious need for medical treatment, by making the use of force videotape and all of the documentation in connection thereof disappeared.

O) Per FDOC rules and procedure 602.033, only a Shift Supervisor or higher has access use of force video tape and all of the documentation in connection thereof.

P) As a Shift Supervisor, Defendant Garmet to make the videotape and documents disappear because of his rank.

Q) Defendant(s) Noe, Zabala, and Garmet pursued their own, independent interests which were largely criminal in nature and entirely apart from

those of their employer.

87) And in other such ways as may be revealed by discovery or trial.

88) The co-conspirators misconduct described in this count was undertaken with malice, and deliberate indifference to the rights of Plaintiff.

89) As a direct result of the Defendants deliberate indifference to Plaintiff's constitutional rights, he suffered severe mental, emotional, and physical injury.

## DENIAL OF FRONT HAND-CUFF PASS

90) On June 18, 2023, Plaintiff sustained injuries to his upper back, cervical spine, and numbness accompanied with a tingling sensation and trembling in his right hand. Plaintiff also start experiencing excruciating pain in his neck and back.

91) On or about the date of June 22, 2023, after being required to submit to handcuffs behind his back, Plaintiff's neck and upper back pain began to intensify and radiate down his spine and right arm, which would linger for hours.

92) As to the claim in paragraph 91, Plaintiff's pain and intensity thereof would very in degree and duration, every time Plaintiff was required to submit to handcuff behind his back.

93) On June 26, 2023, Plaintiff informed Defendant Noe of the intensified pain and suffering that radiated down his spine and right arm that lingered for hours everytime he's handcuffed from behind. For months, Plaintiff continued to make complaints to Defendant Noe, by way of sick call, grievances, and verbal complaints.

94) As to the claim in paragraph 93, with full knowledge of Plaintiff's recent injury, Defendant Noe disregarded Plaintiff's unnecessary pain and suffering by refusing to provide Plaintiff with a front cuff pass, which would allow Plaintiff to be handcuffed in the front with a waist belt securing his hands at waist-line level.

95) Defendant Noe maintained that a person in Plaintiff's position do not qualify for a front handcuff pass, per Centurion policy.

96) Plaintiff have and will continue to suffer the unnecessary pain and suffering unless this court grant a preliminary injunction ordering the Defendant to provide/issue Plaintiff a medical front handcuff pass.

(Section 6:)   PLAINTIFF'S INJURIES

97) As a direct result of the Defendant(s) actions and omissions, Plaintiff was stabbed with a homemade shank three (3) times, causing what may be permanent injury to his cervical spine, permanent reduced/limited mobility of his neck, and permanent visible and embarrassing scars on Plaintiff's forehead and neck.

98) Plaintiff suffered and will continue to suffer excruciating chronic pain in his neck and back, numbness and reduced strength in his right hand, and migraine headaches. And Plaintiff lost consciousness.

99) The Defendant(s) actions and omissions caused Plaintiff to suffer from mental anguish, emotional distress, anxiety attacks, embarrassment and humiliation, fear, and exacerbated Plaintiff's Post traumatic stress disorder. Defendant Tabl deliberately damaged Plaintiff's reputation & character.

## RELIEF SOUGHT

100) Plaintiff respectfully move this Court to enter the following Judgment:

101) Declare that the acts and omissions described herein violated Plaintiff's rights under the constitution and laws of the United States;

102) Defendant(s) be ordered to pay compensatory, nominal, and punitive damages.

103) Issue a preliminary and permanent injunction, and order Defendant(s) to pay all Court costs, legal fees, and medical expenses resulting from this case.

104) Plaintiff demands a trial by jury.

## OATH

I DECLARE under penalty of perjury that the foregoing is true and correct, Signed this 7th day of December, 2023.

/s/ Robert D. Kornegay
Robert D. Kornegay #J13805

## MAILED BY PRISONER

I DECLARE under penalty of perjury that this complaint was delivered to prison officials for mailing on the 14 day of December, 202

/s/ Robert D. Kornegay
Robert D. Kornegay #J13805

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYER DIVISION

ROBERT D. KORNAGAY
        Plaintiff,

-vs-                                    Case#:

SERGEANT R. TABIL, et al.,
        Defendant(s)  /

PLAINTIFF'S EXHIBITS FOR EXHAUSTION OF
ADMINISTRATIVE REMEDIES

EXHIBIT (A) - Informal grievance, Log # 510-2201-0137, (3) pages

EXHIBIT (B) - Formal grievance, Log # 2306-510-136, (3) pages

EXHIBIT (C) - Formal grievance, Log # 2306-510-140, (3) pages

EXHIBIT (D) - Appeal grievance, Log # 23-6-22837, (3) pages

EXHIBIT (E) - Formal grievance, Log # 2309-510-153, (4) pages

EXHIBIT (F) - Informal grievance, Log # 510-2308-0172, (2) pages

EXHIBIT (G) - Appeal grievance, Log # 23-6-30855, (2) pages

EXHIBIT (H) - Formal grievance, Log # 2310-510-010, (2) pages

EXHIBIT (I) - Appeal grievance, Log # 23-6-34073, (2) pages

Reception & Medical Center
Date: 12-14-23
Initials: BY

CLERK'S Office, United States
District Court, US Courthouse
& Federal Building
2110 First Street, Room 2-194
Fort Myers, Fla 33901-3083

December 14, 2023

Dear Clerk of Court

Please find enclosed my 42 U.S.C 1983 complaint. Although
I did not use the prose format forms offered by my prison,
I have included all of the required information and ask
that it be filed with the court as is.
I will be paying the filing fee in this case, but I will like
to know the total cost. Once I'm issued a case #, I'll send
the filing fee from my prison account with the case # attached.
Enjoy the holidays, and thanks for the help!

Respectfully Submitted,
Robert D. Kornagay
Robert D. Kornagay
DC#J13805
BMC-Main Unit
P.O. Box 628
Lake Butler, Florida 32054